IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Planet Aid, Inc. et al., | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | |
| | : | Civil Docket No. 1:16-cv-02974 (GLR) |
| Reveal, Center for Investigative | : | |
| Reporting, et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF LAW ON BEHALF OF PLAINTIFFS PLANET AID AND LISBETH THOMSEN IN OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE, OR IN THE ALTERNATIVE TO TRANSFER VENUE.**

Squire Patton Boggs (U.S.) LLP
2550 M. St., N.W.
Washington, D.C. 20037
Samuel Rosenthal
(Bar No. 06170)
samuel.rosenthal@squirepb.com
(202) 457-6321
Fax (202) 457-6315

Attorneys for Plaintiffs
Planet Aid, Inc.
Lisbeth Thomsen

Of Counsel:
Mark Salzberg

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS .........................................................................................................1

ARGUMENT ...........................................................................................................................10

I.    PERSONAL JURISDICTION EXISTS IN THIS DISTRICT UNDER THE
      MARYLAND LONG-ARM STATUTE ........................................................................10

      A.    Specific Jurisdiction Exists Here ........................................................................10

      B.    Defendants Cannot Defeat Jurisdiction With Unsupported and
            Unsupportable Factual Assertions .......................................................................12

II.   PERSONAL JURISDICTION IS CONSISTENT WITH THE DUE PROCESS
      CLAUSE ........................................................................................................................15

      A.    Personal Jurisdiction is Necessary to Vindicate The Forum's Strong Policy
            In Protecting Those Within Its Borders ...............................................................16

      B.    The Relationship Between the Conduct At Issue and the Forum is
            Sufficient to Confer Personal Jurisdiction ..........................................................18

      C.    Jurisdiction Is Even More Clearly Proper Where, as Here, Defendants
            Focused On A "Maryland-based Charity," and Its Actions ..................................22

            1.    Planet Aid is a "Maryland-Based Charity" ...............................................22

            2.    Defendants Focused On Planet Aid's Activities in Maryland ...................24

            3.    The Defamatory Materials Were "Drawn from Maryland Sources" .........28

III.  VENUE IS PROPER IN THIS DISTRICT ...................................................................31

IV.   THERE IS NO BASIS FOR DISMISSAL OR TRANSFER PURSUANT TO
      FORUM NON-CONVENIENS ....................................................................................34

CONCLUSION........................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akbar v. New York Magazine Co.*,
  490 F.Supp. 60 (S.D.N.Y. 1980)......................................................................................32

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*,
  293 F.3d 707 (4th Cir. 2002) ....................................................................................15, 19

*Boehner v. Heise*,
  410 F. Supp. 2d 228 (S.D.N.Y. 2006)........................................................................32, 34

*Bounty-Full Entertainment, Inc. v. Forever Blue Entertainment Group, Inc.*,
  923 F. Supp. 950 (S.D.Tex. 1996) ............................................................................32, 34

*Bragg v. Linden Research, Inc.*,
  487 F. Supp. 2d 593 (E.D. Pa. 2007) ..............................................................................21

*Brown v. Flowers Industries*,
  688 F.2d 328 (5th Cir. 1982) ..........................................................................................19

*Calder v. Jones*,
  465 U.S. 783 (1984)............................................................................................... *passim*

*Chambers v. Chambers*,
  Civil Case No. RWT 11–765. ___, 2011 WL 3512140 (D. Md. Aug. 8, 2011)......................11

*CIENA Corp. v. Jarrard*,
  203 F.3d 312 (4th Cir. 2000) ..........................................................................................31

*CoStar Realty Info., Inc. v. Meissner*,
  604 F. Supp. 2d. 757, 763-64 (D. Md. 2009)...................................................................10

*Crussiah v. Inova Health Systems*,
  Civ. No. TDC-14-4017, 2015 U.S. Dist. LEXIS 15671, 2015 WL 7294368 (D.
  Md. Nov. 19, 2015)...................................................................................................10, 19

*Cummings v. Western Trial Lawyers Assoc.*,
  133 F.Supp.2d 1144 (D. Ariz. 2001) ...............................................................................33

*Davis v. Costa-Gavras*,
  580 F.Supp. 1082 (S.D.N.Y. 1984) ..................................................................................31

*First American First v. National Assoc.*,
  802 F.2d. 1511 (4th Cir. 1986) ......................................................................12, 18, 21, 24

*Froess v. Bulman*,
  610 F. Supp. 332, 336-37 (D.R.I. 1984), *aff'd without opinion*, 767 F.2d 905
  (lst Cir. 1985) .................................................................................................................18

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011).......................................................................................................24

*Gordy v. Daily News, L.P*,
  95 F.3d 829 (9th Cir. 1996) ...........................................................................................22

*Hare v. Richie*,
  Civ.No. ELH-11-3488, *32, 2012 WL 3773116 (D. Md. Aug. 29, 2012) .............................29

*Hertz v. Friend*,
  559 U.S. 77 (2010)..........................................................................................................23

*Intertech, Inc. v. Delta Int'l Corp.*,
  696 F.2d 1062 (4th Cir. 1982) ........................................................................................19

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984).........................................................................................16, 17, 20, 21

*Lee v. Walworth Valve Co.*,
  482 F.2d 297 (4th Cir. 1973) ..........................................................................................16

*Lex Comp.& Mgmnt, Co. v. Eslinger & Co.*,
  676 F.Supp. 399 (D.N.H. 1987)......................................................................................33

*Miracle v. N.Y.P. Holdings, Inc.*
  87 F.Supp.2d 1060 (D. Haw. 2000) .............................................................................32, 33

*Morton Grove Pharm. v. the National Pediculosis Assoc.*,
  525 F.Supp.2d 1039 (N.D. Ill. 2007) ..............................................................................33

*Murphy v. Erwin-Wasey, Inc.*
  460 F.2d 661 (1st Cir. 1972)...........................................................................................19

*Peteet v. Dow Chemical Co.*,
  868 F.2d 1428 (5th Cir. 1989) ........................................................................................34

*Rusack v. Harsha*,
  470 F. Supp. 285 (M.D. Pa. 1978),.................................................................................18

*SAS Institute, Inc. v. World Programming Ltd.*,
  468 Fed.Appx. 264 (4th Cir. 2012)..................................................................................34

*Shoppers Food Warehouse v. Moreno*,
  746 A.2d 320 (D.C. 2000) ..............................................................................................21

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007)...................................................................................................34

*Stover v. O'Connell Assocs., Inc*.,
    84 F.3d 132 (4th Cir. 1996) ......................................................................................13

*Tamarian Carpets, LLC v. Ahmadi & Sons, Inc.*,
    No. 1:2012cv02571, 2013 WL 3771375 (D. Md. July 16, 2013)............................19

*Wachtel v. Storm*,
    796 F.Supp. 114 (S.D.N.Y. 1992) ...........................................................................33

*Wellness Publ'g v. Barefoot*,
    128 Fed. Appx. 266, 2005 U.S. App. LEXIS 6487 (3d Cir. N.J. 2005) ..................21

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 297-298 (1980) ...................................................................................17

**Statutes**

18 U.S.C. §1391...........................................................................................................31

28 U.S.C. § 1404..........................................................................................................34

Md. Code Ann. Cts. & Jud. Proc. § 6-103(b)(3)....................................................10, 11

**Other Authorities**

Fed. R. Civ. P. 12(b) ...................................................................................................10

http://revealnews.org/planetaid/...............................................................................8, 9

http://www.nbcwashington.com/investigations/Behind-the-Bins-What-Did-
    Planet-Aid-Do-With-Your-Taxpayer-Dollars-380333921.html...............................26

http://www.nbcwashington.com/investigations/Behind-the-Bins-What-Did-
    Planet-Aid-Do-With-Your-Taxpayer-Dollars-380333921.html, at 4:11.............6, 7

https://gannett.investorhq.businesswire.com/sites/
    gannett.investorhq.businesswire.com/files/doc_library/file/105721-
    Annual_Report.pdf....................................................................................................23

## PRELIMINARY STATEMENT

Admitting that they have no other basis for seeking to dismiss the Complaint, Defendants openly confess that their strategy is to avoid addressing the merits of the action by forcing litigation in California, where they will take advantage of that State's anti-slapp legislation. *See* Memorandum in Support of Motion by Defendants to Dismiss (Def. Mem.), at 1, n.1.  No authority supports this blatant forum-shopping.

Defendants have no basis for depriving a Maryland-based charity of the right to sue in Maryland, where defamatory material was directed and received, a substantial portion of the witnesses are located, tortious conduct occurred, and where the target of the defamation and substantial damage from Defendants' conduct exists.  Factual arguments advanced by Defendants are contrary to their own admissions elsewhere, including claims that Plaintiff Planet Aid has no real presence in Maryland, no witnesses are located here, and the stories were not really about anything occurring in Maryland.  It is particular troublesome that Defendants have claimed in their Memorandum that none of their actions were directed at Marylanders when they specifically targeted Maryland residents doing business with Plaintiff Planet Aid in Maryland, and then directed their defamatory stories specifically to those individuals in a campaign to negatively influence views about Planet Aid.  *See infra* 12-14.

## STATEMENT OF FACTS

### A.    Planet Aid

This suit is brought by a Malawi resident, Lisbeth Thomsen, and Planet Aid, a charitable organization incorporated in Massachusetts which has its principal place of business in Maryland.  Complaint, ¶ 17.  Approximately 75 individuals are employed at Planet Aid in Maryland.  Neltrup Dec., ¶ 5.  These employees are housed in two locations, one the processing

center and operations headquarters in Elkridge, Maryland; the other is a thrift center in Catonsville, Maryland. *Id.*

Planet Aid is engaged in two charitable endeavors. One business is the collection of used clothes. Neltrup Dec., ¶ 6. In order to operate its business, Planet Aid also maintains a processing center in Maryland where clothes are collected, processed and sold, with the proceeds going to charities. *Id.* The boxes or bins used for clothes collection are located in a number of jurisdictions, with Maryland acting as a regional servicing center. *Id.* In this capacity, Maryland services more bins than any other servicing center. *Id.* Maryland employees manage both bin placement and pick-up within Maryland, and outside the state as well. *Id.*

Beginning in March, 2016, Planet Aid was the subject of a series of defamatory articles and broadcasts published and aired by Defendants and which are at issue in this case. Complaint, ¶¶ 49-55. Following publication of the defamatory articles, bins serviced by the Maryland office have been vandalized. Neltrup Dec., ¶7. Planet Aid has also been instructed by property owners to remove a substantial number of bins following publication of the articles and broadcasts by Defendants. *Id.* It can reasonably be estimated that the loss in revenue to the Maryland office alone from the removal of bins well exceeds $100,000. *Id.*

Planet Aid also operates a donor program from its Maryland offices. Neltrup Dec, ¶ 9. Five staff members are employed by Planet Aid relating to partnership or donor programs. *Id.* All of these individuals, with one exception, are located in Planet Aid's Elkridge Maryland operations site, and are Maryland residents. *Id.* Similarly, the President of Planet Aid, Ester Neltrup, and the Chief Operating Officer, Fred Olsson, work at the headquarters facility in Elkridge and are Maryland residents. *Id.* ¶¶ 3,10.

One grant obtained by Planet Aid was the Food for Progress program established and funded by the United States Department of Agriculture (USDA).  This grant, and Plaintiffs' management of it, was the subject of the defamatory material by Defendants which gave rise to this lawsuit.  *See* Complaint, ¶¶ 49-56.  Planet Aid managed that contract from its Maryland partnership office.  Neltrup Dec., ¶ 10.  Because Planet Aid's donor programs are managed in Maryland, Defendants' actions further damaged Planet Aid in Maryland.  *Id.* Dec., ¶ 9.

**B.      Defendants**

The three Defendants in this case consist of Reveal, the Center for Investigative Reporting ("Reveal" or "Defendant Reveal"), and two of its reporters, Amy Walters and Matt Smith.  Defendants claim to be unique in airing programs over different types of media.[1]

One such type of media is the internet.  Defendant Reveal places articles on the internet, which can be accessed anywhere in the U.S., including Maryland.  The internet site is interactive, and Reveal urges viewers to download content, share it with others, act as a source for existing stories, provide pitches for new story ideas, or most important, donate to Reveal.  *See* Rosenthal Dec., Ex. K.  A second way in which Defendants reach their audience is through radio shows and "podcasts."   Third, Defendants did not rely simply on radio, but used television specifically in order to broadcast the stories about Planet Aid within Maryland.  As discussed in greater detail below, one television station used by Defendants to distribute defamatory material to Maryland residents was NBC, Channel 4, Complaint, ¶ 49-55, which airs throughout Maryland.  *See* Rosenthal Dec., Ex. N.  Finally, the fourth way in which Defendants distribute their material is through their active use of social media.  Defendant Reveal alone has issued over 10,000

---

[1] Defendants' self-congratulatory declarations about their own achievements, *see, e.g*., Walters Dec., ¶ 6, Smith Dec., ¶ 5, fail to include one of the three authors of the May 23, 2016 article, who was a convicted felon and employee of Defendant Reveal, Complaint, ¶ 4, and whose byline appears on the article. *See* Complaint, Ex. B, at 1. While claiming that all witnesses related to the investigation, writing and publications of the article are located in the Northern District of California, they fail to mention their co-author even a single time in their Memorandum.

"tweets" on Twitter.  *See* Rosenthal Dec., Ex. B-1.  Defendant Walters has issued over 6,000 tweets.  Rosenthal Dec., Ex. B-2.  Notwithstanding their representations to this Court to the contrary, *see*, *e.g.*, Def. Mem. at  10, Defendants directed social media directly to Maryland residents.  *See infra* at 8-10, 12-14.

> ### C.      The Claims of Civil Conspiracy, Tortious Interference and Defamation

This suit claims that Defendants engaged in a series of tortious acts, including engaging in a civil conspiracy, tortiously interfering with prospective business advantages or relationships and defamation.  Each of these claims resulted in injuries to Planet Aid in its Maryland operations.  The bulk of this conduct occurred through these four types of media utilized by Defendants.  *See infra* at 4-10.

Focusing on only one way in which Defendants are alleged to have tortiously interfered with Plaintiffs,[2] Defendants argue that "publications that Plaintiffs complain libeled them all were published online, were not directed to Maryland, do not involve Maryland concerns, and even when alleged to appear in outlets near Maryland, actually emanated from outside the state." Def. Mem. at 2.  The facts are otherwise.  As shown below, repeatedly describing their stories as involving wrongdoing by a "Maryland-based charity," *see infra* at 22-24, Defendants did not limit themselves to the internet, but broadcast their stories directly into Maryland from radio and television stations in D.C. and Maryland.  *See infra* at 5.  And finally, in case some Maryland residents somehow missed the story, Defendants and those assisting them tweeted the defamatory materials directly to targeted Maryland residents.  *See infra* at 8-10, 12-14.

---

[2] Defendants say little about the bulk of the allegations in Counts I and II, alleging civil conspiracy and tortious interference, focusing instead on the defamation claims.

### 1. The Radio Broadcasts on March 19, May 28 and June 2, 2016

The stories about Planet Aid began with a radio broadcast on March 19, 2016 on WAMU, which was broadcast in Maryland through several separate channels. One such channel, WAMU in Washington, D.C. (FM channel 88.5) is broadcast directly into Maryland from the station's D.C. transmitters.

While claiming that no "outlet" in Maryland exists, *see* Def. Mem. at 6, 7, Defendants' own website disputes that claim. Rosenthal Dec., Ex. K.[3] In addition to DC radio station FM 88.5, Defendants' website states that Reveal airs its stories on four radio stations in Maryland itself. Defendant Reveal identifies the following stations where listeners can "hear Reveal"[4]

| Baltimore | MD | WYPR | WYPR-FM | 88.1 | Friday | 1:00 PM |
| Frederick | MD | WAMU | W228AM | 93.5 | Sunday | 4:00 PM |
| Ocean City | MD | WAMU | WRAU | 88.3 | Saturday | 4:00 PM |
| Paramount | MD | WAMU | W228AB | 93.5 | Sunday | 4:00 PM |

The March 19, 2016 Broadcast[5] claimed, among other things, that Plaintiff Planet Aid was stealing money from the USDA, siphoning it off to other countries, and misrepresenting to the USDA salaries paid to employees who were forced to kickback money. *See* Complaint, Count III. While devoting a considerable portion of their declarations to previous awards received by those authoring the materials in question (while failing to mention that one was a convicted felon, *see supra*, n.1), not one of the three Defendants disputes having made the foregoing statements, that all such statements were false, and that Defendants acted with "malice."

---

[3] While we demonstrate that their factual claims are meritless in any event, Defendants' claims that broadcasts must emanate from within Maryland is also directly contrary to Supreme Court and Fourth Circuit precedent. *See infra* at 17-19 (cases collected where material was sent from outside forum).

[4] *See* Rosenthal Dec., Ex. K. Station FM 88.3 claims that its stories "mirror" that of WAMU in the District. *See, e.g., id.,* Ex. M . Defendants ignore these other Maryland stations when Defendant Reveal's Editor-In-Chief specifically acknowledged being aware that Reveal's stories aired on 364 radio stations. *See* Pyle Dec., ¶ 7.

[5] All of these broadcasts through these different Maryland stations are referred to as the "March 19th Broadcast," although not necessarily broadcast on that date.

The Defendants again took to the airwaves on May 28, 2016, when they ran an "update" of the March 19th Broadcast. Complaint, ¶ 55. None of the offending material was taken out of the broadcast, which was run in its entirely with additional updates from the Defendants' alleged "investigation." Once again, according to Defendants' website, listeners could hear the story throughout Maryland on five different radio stations. It was broadcast a third time on June 2, 2016, once again on the same radio stations. *Id.*

### 2. The NBC I-Team-Reveal Joint Investigation Broadcasts on May 23 and 24, 2016

Two additional broadcasts occurred in which Defendants made defamatory statements about Planet Aid, and specifically targeted Maryland residents. Those broadcasts involved a joint investigation by NBC Channel 4 I-Team and Defendants (The "Reveal-NBC I Team Broadcast(s)"). *See* Complaint ¶ 55. The principal reporter on both broadcasts is a Maryland resident, Ms. Tisha Thompson. *See* Rosenthal Dec., ¶ 28. That broadcast reported the "findings" by Reveal, *inter alia*, that employees were required to kickback 20-100% of their salaries to the Teachers Group. *See* Complaint, Count VI. The stories also continued to include a great many of the falsehoods reported by Defendants in their March 19th Broadcast.[6]

In the Reveal-NBC I-Team broadcasts in Maryland, Defendants together with NBC reporter and Maryland resident Thompson again reported the results of the Reveal "investigation." The broadcast also reported statements by Smith, among other things, that Planet Aid had put out "totally fraudulent propaganda." *See* http://www.nbcwashington.com/ investigations/Behind-the-Bins-What-Did-Planet-Aid-Do-With-Your-Taxpayer-Dollars-

---

[6] Defendants erroneously contend that the only statement at issue in the two broadcasts is a single statement by Defendant Smith. While one defamation count refers specifically to Smith's statement on the Reveal-NBC I-Team broadcast, *see* Count VI, the Complaint relies specifically on both broadcasts, in their entirety, occurring on both May 23 and 24, 2016, see Complaint, ¶55, Ex. H, and incorporates by reference allegations relating to them in each count, including not only the counts for defamation, but also for civil conspiracy and tortious interference.

380333921.html, at 4:11 min.  The NBC article also repeated the claim made on March 19th by Smith that each village got only one substandard water pump and were required to buy the rest from Planet Aid, even though they could not afford the pumps.  *Id. a*t 4:15 min.  And as in the March 19th Broadcast, the Reveal-NBC I-Team Broadcast on May 24, 2016 repeated the false and defamatory claim that employees were forced to kickback 20-100% of their salaries.  *Id.*, at 3:30 min. Despite claims that there was no "local distribution," Def. Mem. at 22, these shows were broadcast throughout Maryland by NBC Channel 4.

On the Reveal-NBC I-Team Broadcasts, listeners were encouraged to stop funding Planet Aid by ceasing to donate clothing to the company.  The jointly authored program by Defendants and NBC I-Team, admonished listeners not to donate to Planet aid bins.  *See* Complaint, ¶ 59. The show also alerted viewers to the fact that Planet Aid was located in Maryland, advising no less than three times that Planet Aid was a Maryland-based charity, and that its TV guest was a former employee at the "Elkridge Maryland Planet Aid" company.  *See id*.

### 3.  The Internet Stories

The third way in which Defendants circulated their defamatory material was through the internet.  Defendants ran a series of stories on the internet about Planet Aid.  Internet stories about Planet Aid and either published by Defendants or containing statements by them ran on March 19, 2016 (accompanying the radio broadcast), May 23, 2016, and August 1, 8, 17 and 18, 2016.  Complaint, ¶ 51.  These stories included highly derogatory statements about Planet Aid that included, for instance, that Planet Aid was involved in "systemic fraud," the USDA was giving "millions of dollars to a group that is being investigated for fraud, tax evasion and

pilfering of humanitarian funds . . ." and that Planet Aid was siphoning away 50-70% of the $130 million obtained from the USDA.  Complaint, Count V, ¶ 185.[7]

### 4.  The Social Media Campaign

A fourth way in which Defendants sought to interfere with Planet Aid's existing relationships and to disseminate defamatory material was by using social media to send materials to individuals having some involvement  with Planet Aid.  *See, e.g.,* Complaint, ¶¶ 195(c) (alleging that Defendants used "social media, in order to maximize the chances that the false and defamatory statements and false light in which Plaintiffs were cast would have the maximum impact"), 198, 203.  At least one Defendant apparently tracked usage of social media used by Planet Aid supporters, and then sent them links to the defamatory materials. *Id.* at ¶¶ 62, 63.

Notwithstanding Defendants' outright denial of such facts, *see* Def. Mem. at 2, this campaign also included sending material directly to Maryland residents.  For instance, one Maryland resident tweeted on June 12, 2016 about Planet Aid's store:  "SO IMPRESSED with store in Catonsville, MD. Clean, well-organized, excellent service, great deals. THANK YOU!!!!"  Rosenthal Dec. Ex. C. Defendant Walters responded to this Maryland resident directly on June 20, 2016 by tweeting him a link to Defendants' defamatory material, writing: "Check out our Planet Aid investigation http://revealnews.org/planetaid/," *Id*.  The tweet contained a link that brought the defamatory material directly to this Maryland resident.

---

[7] Defendants erroneously represent that their website is not "interactive," see Def. Mem at 13, when it contains the following:

> Do you have experience with the Teachers Group or affiliated organizations such as Planet Aid? Are you a current or former U.S. government employee who has come into contact with Planet Aid fundraising efforts?
>
> We want to hear from you. Get in touch with reporters Matt Smith and Amy Walters at msmith@cironline.org and awalters@cironline.org. If you'd rather have our reporters contact you, share your information here.

*See* https://www.revealnews.org/article/us-taxpayers-are-financing-alleged-cult-through-african-aid-charities/.  It is fairly likely that any number of the Maryland sources claimed in the articles to have been interviewed, including the one appearing on NBC I-Team television report, see Complaint, ¶¶ 48-55, actually responded to the above solicitation.

The same thing happened when a Maryland resident urged those following her to come out and shop at the Planet Aid store. *Id*. Ex. D. Defendants used that as an opportunity to send their defamatory March 19th podcast directly to this Maryland resident. *Id.* Defendant Walters who sent out the tweets obviously knew that she was not disseminating the tweet (and the defamatory material) nationally (as claimed in Defendants' Memorandum), but was specifically targeting a shopper at Planet Aid's Catonsville, Maryland store.

Nor was the use of social media in this way "random," "isolated" or "fortuitous," despite Defendants' claims to the contrary.[8] *See* Def. Mem. at 17. Just as Defendants' March 19th Broadcast was airing throughout Maryland, Defendant Walters urged readers:

> And the podcast is out! Listen! Learn about the crazy places your tax dollars are going! Follow the money! Be part of the investigation! Talk about it on Twitter! Give us new tips for follow ups! Tells us about you [sic] Amdi Petersen sightings!

Rosenthal Dec. Ex B-4. She was joined days later by Defendant Smith, who urged readers to "spread the word" about the stories. *Id*., Ex. B-5.

There is no shortage of examples other than those discussed above, demonstrating that Defendants were disseminating the defamatory stories through social media (*see* Rosenthal Dec., Ex. G), and that such material was being received by Maryland residents. *See id*., Ex. F-2 (material received by Rose River Farm and Cordell Pugh), Ex. G-1,2 (receipt of material by someone using the handle @nayasala, who is located in Maryland); *see also infra* at 14 (material sent to potential job seekers in Maryland). It is just as well established that other Maryland residents were actually initiating tweets with the defamatory material. *See* Rosenthal Dec., Ex. F-1 (tweets by Maryland resident Tisha Thompson to other Maryland residents). Given that these defamatory materials were being sent out not only by Defendants, but by those claimed to

---

[8]Facebook was another social media vehicle used to ensure that the defamatory material was received by Maryland residents. *See* Rosenthal Dec. Ex. B-4.

be involved in a joint effort with the Defendants, the Court can infer that such materials were sent at Defendants' direction to "talk about it on Twitter!," or Defendant Smith's request that listeners "spread the word." *See supra* at 9.

Defendants also made defamatory statements directly to Maryland residents in order to obtain information by convincing them that Defendants had evidence of wrongdoing by Planet Aid.  In doing so, Defendants did not simply ask sources for information, but falsely claimed, among other things, that they had been told that "at least half of that USDA donations meant for projects in Malawi never made it to the people or projects they were supposed to help." Lichtenberg Dec. Ex. A.  Another email sent to Planet Aid employee in Maryland  by Defendant Smith on August 16, 2016, quoted requests for an investigation based on  Defendants' reports that Plaintiff Planet Aid was "part of an international criminal organization."  *Id*., Ex. B.

## ARGUMENT

### I. PERSONAL JURISDICTION EXISTS IN THIS DISTRICT UNDER THE MARYLAND LONG-ARM STATUTE

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b), Plaintiff need only make a *prima facie* showing, and in evaluating that showing the court "must accept the plaintiff's allegations as true, and it must draw all reasonable inferences and resolve any factual conflicts in the plaintiff's favor."  *Crussiah v. Inova Health Systems*, Civ. No. TDC-14-4017, 2015 U.S. Dist. LEXIS 15671, *7, 2015 WL 7294368 (D. Md. Nov. 19, 2015) (citing C*oStar Realty Info., Inc. v. Meissner,* 604 F. Supp. 2d. 757, 763-64 (D. Md. 2009)).

### A. Specific Jurisdiction Exists Here

Personal jurisdiction exists in this case under Maryland's long-arm statute, Md. Code Ann. Cts. & Jud. Proc. § 6-103(b)(3) (jurisdiction as to anyone who "[c]auses tortious injury in

the State by an act or omission in the State").[9]

Defendants cannot seriously dispute that personal jurisdiction exists here when:

- Defendants tortiously injured Plaintiffs by, among other things, publishing and broadcasting defamatory statements about them, which were distributed in Maryland;
- Planet Aid is a "Maryland-based charity," to use Defendants' own words (*see infra* at 22-24);
- The focus of the articles was on Planet Aid's alleged misconduct with respect to the USDA Food for Progress program, which Planet Aid managed from its Maryland headquarters (*see supra* at 3; *infra* at 24-28),
- According to Defendant Reveal's website, the offending broadcasts aired on radio stations located wholly within Maryland, as well as on a radio station that directs its broadcasting into Maryland from across the DC border (*see supra* at 5);
- Defendants also broadcast the defamatory material on two television shows that aired throughout Maryland (*see supra* at 6);
- The principal reporter on those television shows is a Maryland resident (*see* Rosenthal Dec., ¶ 28);
- The radio and television broadcasts relied on sources named in the material who are Maryland residents (*see infra* at 28-30);
- In addition to named sources, the Defendants relied on anonymous sources who are Maryland residents (*see infra* at 30);
- The offending material also relied on documents generated by Planet Aid in Maryland, (*see infra* at 30);
- In "investigating' their stories at issue in the case, Defendants sent multiple emails to Maryland residents (*see infra* at 33);
- Two of the three Defendants, Smith and Walters, actually traveled to Maryland in connection with the stories, (*see* Smith Dec., ¶ 7).
- Defendants personally distributed the defamatory material using social media directed specifically to Maryland residents, among others (*see supra* at 8-10, 12-14);

---

[9] Although the Court need not reach this issue because jurisdiction is so clearly established under Md. Code Ann. Cts. & Jud. Proc. § 6-103(b)(3), jurisdiction exists also under §6-103(b)(4), based on Defendants' persistent contacts in this District, which include the use of radio, television, email and social media, as well as their website and internet distribution of their articles and broadcasts. *See Chambers v. Chambers*, Civil Case No. RWT 11–765, 2011 WL 3512140 (D. Md. Aug. 8, 2011) (jurisdiction appropriate based on making a false filing in the Orphans Court, and "creat[ing] blogs, post[ing] comments on websites, and [sending] emails to Maryland residents and towns in an effort to defame Plaintiff." *See id.*, at *4.

Further, under § 103(b)(1), jurisdiction exists as to "anyone who, directly or through an agent," "performs any character of work or service in the State." Defendants Smith and Walters admit that they both traveled here in connection, specifically, with the defamatory stories about Planet Aid. *See, e.g.*, Walters Dec., ¶ 8. Smith also repeatedly emailed individuals in this state, looking for information. *See* Lichtenberg Dec.; Teppih Dec. Defendant Smith's contention that he took photos in Maryland which were never used, Smith Dec., ¶ 7 cannot save the day. Whether it was Smith's particular photos or those of another reporter that were used makes no difference. The defamatory stories on NBC on May 23 and 24, 2016 make clear that the site visit was key to the story. *See* Rosenthal Dec. Ex J (pictures used in the story).

- In response to Defendants' request to "tweet about it," and "spread the word," NBC reporters working on a joint investigation with Defendants sent the defamatory material to other Maryland residents (*see infra* at 10); and
- Defendants' actions were directed toward Plaintiff's operations in Maryland and injured Plaintiff Planet Aid in those operations in Maryland  (*see supra* at 2, 4-10, 24-28).

Any comparison of the above facts with those discussed in other controlling cases where jurisdiction has been sustained shows that more than the requisite contact with Maryland exists here.  *See, e.g.*, *First American First v. National Assoc.*, 802 F.2d. 1511, 1517 (4th Cir. 1986) (finding jurisdiction proper based on mailing letters to the forum, which accords with other courts that have found jurisdiction based on "single contact" letters or telephone calls by out-of-state defendants to persons in the forum state).  *See also infra* at 19-20 (cases collected).

## B.   Defendants Cannot Defeat Jurisdiction With Unsupported and Unsupportable Factual Assertions

Defendants argue that a court may consider sworn affidavits or other admissible material outside the pleadings in determining whether a *prima facie* case has been established for asserting jurisdiction.  *See* Def. Mem. at 3.  Assertions critical to their arguments, however, are not supported by any affidavit or otherwise.  A declaration offered in support of two other factual claims is flatly refuted by the actual facts.

First, Defendants claim that they did not "direct their conduct" at "Maryland or Marylanders in any way."  Def. Mem. at 2.  *See also id*. at 6 (asserting that "none [of the defamatory material] was directed at Maryland residents.").  None of the four declarations submitted to this Court support those contentions, and for good reason: they are not true.

To take one example, the tweet sent by Defendant Walters to Chipmunk07 with a link to the defamatory material at issue in this case, *see supra* at 9, is sufficient to refute the spurious claim that Defendants did not "direct the material at Maryland residents," and that there is "no evidence that Reveal reached out and encouraged Marylanders to interact with the articles or

podcast." *See* Def. Mem. at 13. Similarly, Defendants cannot ask the Court to accept their claimed lack of any contact "with Marylanders" when they engaged in the same conduct with "LBRconsulting." *See supra* at 8. As with Chipmunk07, when LBRconsulting dared to complement Planet Aid's operation in Maryland, Defendant Walters sent him a tweet stating "check out our Planet Aid investigation," and provided a link to the defamatory stories. *Id.* Defendants knew that LBRconsulting and Chipmunk07 both resided in Maryland; that fact was obvious not only from the substance of their tweets (referring to Planet Aid's store in Maryland[10]), but their respective profiles both confirmed their Maryland location. *See* Rosenthal Dec., Ex. C-2; Ex. D- 2.[11]

And a third example is found in a posting by Planet Aid from its Elkridge, Maryland offices on a career employment website, "Indeed," looking for employees interested in working in Planet Aid's development office in Elkridge. Neltrup Dec. ¶ 13. American University School of International Studies (AUSIS) monitors the Indeed website for job opportunities for its graduates. *Id.* AUSIS tweeted the job opportunity posted by Planet Aid to job-seekers, many of whom obviously live in Maryland given their proximity to the University. *Id.*

Similar to tweets directed to Chipmunk07 and LBRconsulting, Defendant Walters personally replied to the AUSIS tweet that had a link to the Planet Aid job opening in Maryland with a link to the defamatory article. Rosenthal Dec. Ex. E. Defendant Walters' inclusion of the

---

[10] The tweet by Chipmunk07 which generated the response from Defendants stated: "Come out to thrift shop with me!! Planet Aid Thrift Center 5425 Baltimore National Pike, Baltimore, MD. 21229." *See* Rosenthal Dec., Ex. C. The tweet by LBRConsulting which generated the response by Defendants was: "@Planetaid. SO IMPRESSED with store in Catonsville, MD. Clean, well-organized, excellent service. THANK YOU." Rosenthal Dec., Ex. D.

[11] A fitting contrast is *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 137 (4th Cir. 1996), where the Court noted that personal jurisdiction could not be based on a single phone call to Maryland simply requesting a credit check when the defendant had no control over how the person performed that credit check. *Id.* at 135. The same cannot be said here, as Defendants "purposefully availed themselves of the privilege of conducting activities in this state" when they were the ones who controlled who, how or when the defamatory material was disseminated in Maryland specifically to persons known to be Maryland residents, such as Chipmunk07 or LBRConsulting, or by radio stations or television stations Defendants affirmatively chose to use to air their programs.

@planetaid Twitter handle in her reply ensured that her response would be viewed by individuals interested in Planet Aid, including Maryland residents, and discourage AUSIS from further broadcasting Planet Aid's job openings. Neltrup ¶ 14. It is astonishing that Defendants would say that their actions were not "directed at Maryland or Marylanders in any way" when Defendant Walters' actions were directed at discouraging anyone from responding to Planet Aid's job posting for a position in Maryland, which would have been of most interest to job-seekers living in Maryland.

Second, Defendants claim that there was no "Maryland outlet" for any of the defamatory stories, *see* Def. Mem. at 6, and that none of the defamatory reports were "aired or disseminated by outlets based in Maryland." *Id.* at 7. Not only is there no declaration supporting this contention, but one declaration actually undermines this claim. One declaration boasts that "'Reveal'" is currently syndicated to more than 364 radio stations across the country." Pyle Dec., ¶ 7. Defendants' website reflects multiple outlets within Maryland that air their stories, not including NBC Channel 4 and WAMU FM Station 88.5. *See supra* at 5. While jurisdiction would exist even if none of these stations broadcast the defamatory stories, none of Defendants' declarations dispute that any or all of them actually did so.

Moreover, two other factual contentions are actually supported by a declaration from Defendant Reveal's Editor-In-Chief, but flatly contradicted by indisputable facts. First, Reveal's Editor-in-Chief declared that "[a]ll of the stories that are the basis of Plaintiff's lawsuit were edited, recorded and posted online and made available to listeners and readers across the nation through the actions of CIR employees working in CIR's newsroom in Emeryville, California." Pyle Dec., ¶ 10. The Complaint, however, makes clear that the Reveal-NBC I-Team broadcasts on May 23 and 24, 2016, very clearly forms, in part, the basis of the lawsuit. *See* Complaint,

- 14 -

¶ 55.  Far from being made available to listeners and readers solely by "CIR employees working in CIR's newsroom in Emeryville, California," Reveal's Editor-in-Chief obviously had to know when she filed her declaration that the main reporter in the story was not a resident of California. *See* Complaint, Ex. H, [12]  The lead reporter on that story, Ms. Tisha Thompson, is a Maryland resident, *see* Rosenthal Dec., ¶28, and does not live or work in Emeryville, California.

Second, another statement by Reveal's Editor-in-Chief is flatly contradicted by available facts, namely that Reveal podcasts and articles "include[] no Maryland-centric content or focus whatsoever."  Pyle Aff., ¶ 11. Even aside from the articles in question in this case, Defendant Reveal's own website reflects articles about matters of local or regional concern in Maryland, in particular, and call into further question the veracity of the declaration.  These articles include one aptly labeled "Maryland."  *See* Rosenthal Dec. Ex. L, at 1.[13]

## II.  PERSONAL JURISDICTION IS CONSISTENT WITH THE DUE PROCESS CLAUSE

Maryland courts hold that jurisdiction under the Maryland statute is co-extensive with the limits allowed under the Due Process Clause.  *See, e.g., ALS Scan, Inc. v. Digital Serv.*

---

[12] Defendants Smith and Walters actually appeared in the byline of the NBC story. *See* Rosenthal Dec., Ex. H.

[13] Stories posted by Defendant Reveal on its own website, and therefore obviously available to its Editor-in-Chief, include the following titles:

"Maryland"(the actual title of the Article) (discussing the actions of the "Homeland Security and Intelligence Division of the Maryland State Police"), published May 3, 2010;

"Maryland to store license-plate scanner data at intel fusion center" (discussing Maryland records), published August 9, 2010;

"Lawn Chemical Laws" (reporting that "Maryland lawmakers are considering legislation that would make Maryland the first state in the nation to require warning signs when lawn care firms apply chemicals."), published March 5, 1986;

"Meet the poster-child for discrimination investigations" (discussing the EEOC investigation of Maryland company Aerotek), published June 20, 2016.

"Complaints, Loses Spur BBB Shakeup (reporting that "[t]he Better Business Bureau of Greater Maryland Inc. — the nonprofit association that encourages local businesses to behave ethically — is being reorganized to address declining membership and allegations that its salesmen used improper pitches to persuade local businesses to become dues-paying members."), published on September 14, 1995.

"Taking the Climate Fight to the Table" (reporting about climate friendly cooking and restaurants in Baltimore, including Artifact Coffeehouse and Woodbury Kitchens), published December 17, 2002.

Rosenthal Dec. Ex. L.

*Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).  We deal below with each of Defendants' arguments offered in support of their motion claiming that jurisdiction would violate the Due Process Clause.

> **A.     Personal Jurisdiction is Necessary to Vindicate The Forum's Strong Policy In Protecting Those Within Its Borders**

In order to avoid having to defend its conduct in Maryland, Defendants claim that it would offend the interests of justice and fair play to maintain the suit in this District.  Controlling case law compels precisely the opposite conclusion.

Opining specifically in the context of a defamation case, the Supreme Court has held that there is a strong public interest in finding jurisdiction where an out-of-state defendant publishes false statements likely to mislead or injure those located in the forum.  The Court in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 772 (1984), held that a "state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory."  To the extent that a defamatory statement not only misleads the citizenry in a forum, but also actually injures residents of the State, there is an even stronger reason to give the plaintiff his or her day in court. As the Fourth Circuit held, a forum has a "substantial interest" in asserting jurisdiction so that those in a forum can recover for injuries sustained by them, even by non-residents.  *See Lee v. Walworth Valve Co.*, 482 F.2d 297, 299-300, (4th Cir. 1973) (holding that "[t]he interest of [the forum state] is substantial, however, for it has a paternal interest in the recovery by one of its citizens of appropriate compensation, if there is a substantive cause of action.").

Here, Maryland is the place where Planet Aid suffered the most injury.  As reflected in the affidavit of Planet Aid's President, those injuries consist not simply of vandalism to its bins, but also injuries include both the loss of business from its used clothing business, as well as

damage to its reputation and the likelihood that present and future donor partners will not do business with Planet Aid. *See* Neltrup Dec. ¶¶ 7, 9.

Defendants offer two responses. They argue, first, that because Planet Aid's reputation was impacted around the globe, or at least in its dealings outside of Maryland, jurisdiction should be found lacking. The issue is not, however, whether Planet Aid suffered damage elsewhere, but whether minimum contacts exist in Maryland. *See, e.g.*, *Keeton*, 465 U.S. at 772 (jurisdiction existed in New Hampshire even though plaintiff was not even present there).

Second, Defendants argue that, being based in California, they had no reason to believe that they would be "haled into court" in Maryland to answer for any of the defamatory material they published. *See* Def. Mem. at 8-9. But that claim was addressed and rejected by the Supreme Court in *Keeton,* 465 U.S. at 781, where it found that there was personal jurisdiction in a libel action based on conduct far less pervasive in the forum than exists in the case *sub judice*.

The Supreme Court in *Keeton* held that "[w]here, as in this case, respondent Hustler Magazine, Inc., has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." 465 U.S. at 781 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 297-298 (1980). Notwithstanding the fact that the plaintiff did not even live in New Hampshire and was not the target of defamatory attacks in his home forum, the Court held that due process would not be offended by having the Defendant "haled into court" there. 465 U.S. at 774.

The conduct here is far more continuous and pervasive than that at issue in *Keeton*. While a person in *Keeton* would have had to go to the newsstand so that they could buy a copy of Hustler magazine, then view the offending language, here Defendants took affirmative steps to expose anyone in Maryland to the defamatory material through repeated stories on the radio,

television and the internet, and then, additionally, sent such material to targeted Maryland residents such as Chipmunk07, LBRconsulting, AUSIS, or others. *See supra* at 8-10, 12-14.

Consequently, controlling Supreme Court precedent demonstrates that there is nothing unfair about having Defendants "haled into court" in this forum.

**B.      The Relationship Between the Conduct At Issue and the Forum is Sufficient to Confer Personal Jurisdiction**

Defendants mistakenly argue that "even in the unlikely event that Defendants' online publications caused injury in Maryland, personal jurisdiction is lacking because Defendants' actions were not focused on or directed toward Maryland."  Def. Mem. at 10.  Further, Defendants argue that because its conduct in Maryland was "random, isolated or fortuitous," jurisdiction is lacking even if Planet Aid "felt the effects of any libel in [the forum state]."  Def. Mem. at 10, 17.  This argument is factually and legally flawed.

There was nothing "random, isolated or fortuitous" about Defendants' conduct here.  Any comparison of Defendants' conduct here – in which they, among other actions, ran radio and television shows both to, and within Maryland, contacted Maryland residents by email, and engaged in a social media campaign in which they and their co-conspirators directly contacted Maryland residents, is far more than required for personal jurisdiction to exist.  *See, e.g.*, *First American First,* 802 F.2d. at 1517 (holding that its decision to sustain jurisdiction based on mailing letters to the forum accords with other courts that have found jurisdiction based on "single contact" letters or telephone calls by out-of-state defendants to persons in the forum state); *id.* at 1517 (approvingly citing *Rusack v. Harsha,* 470 F. Supp. 285 (M.D. Pa. 1978), for the proposition that personal jurisdiction existed even though the "only contact [by defendant with the forum] was the mailing of copies of an allegedly defamatory letter from out-of-state to plaintiff's place of employment"); *id.* (citing *Froess v. Bulman*, 610 F. Supp. 332, 336-37 (D.R.I.

1984), *aff'd without opinion*, 767 F.2d 905 (lst Cir. 1985) (personal jurisdiction based on "allegedly libelous letter mailed by defendant in Maryland to plaintiff's employer" in forum). *See also Intertech, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1068-69 (4th Cir. 1982) (personal jurisdiction in claim for tortious interference where the out-of-state defendant made written and telephonic communication with the plaintiff); *Vishay Intertechnology Inc. v. Delta International, Corp.*, 696 F.2d 1062 (4th Cir. 1982) (finding personal jurisdiction over an out-of-state defendant where less than a dozen telephone and written communications with plaintiff, and expressly approving of *Murphy v. Erwin-Wasey, Inc*. 460 F.2d 661 (1st Cir. 1972) (personal jurisdiction appropriate based on a "few phone calls and letters to the plaintiff")); *Brown v. Flowers Industries*, 688 F.2d 328, 336-37 (5th Cir. 1982) (personal jurisdiction predicated on allegedly defamatory telephone call from Indiana to forum state); *Crussiah*, 2015 U.S. Dist. LEXIS at *11 (construing Fourth Circuit precedent as allowing "specific jurisdiction over an out-of-state defendant who sent defamatory letters about a Virginia plaintiff to parties in Virginia.").

Defendants try unsuccessfully to bring the facts here within the ambit of cases like *ALS Scan Inc*., where personal jurisdiction was claimed based solely on the use of the internet. The Court in that case recognized that if the mere use of the internet was sufficient to create personal jurisdiction, then jurisdiction would exist in every forum. Finding that "the only direct contact that Digital had with Maryland was through the general publication of its website on the Internet," the Court held that jurisdiction did not exist even if there were effects felt in the forum. *ALS Scan, Inc*., 293 F.3d at 715. The same is true of *Tamarian Carpets, LLC v. Ahmadi & Sons, Inc.*, No. 1:2012cv02571, 2013 WL 3771375, at *4 (D. Md. July 16, 2013) (no jurisdiction simply from maintaining a website).

That is not even close to our situation.  Far from relying solely on the internet articles, Plaintiffs here have demonstrated that Defendants contacted individuals in Maryland, ran stories on local radio and television shows, and then used social media not only to send the offensive material to Maryland residents, but they also used that social media to solicit information to use in the campaign against Plaintiffs.  *See infra* at 29-30.

Nor is it convincing to argue, as Defendants do, that the Court cannot consider the radio and television programs because they were broadcast into Maryland from the District of Columbia. Even if the Court were to ignore Maryland based radio stations[14] and other contacts, this case presents an even stronger case for personal jurisdiction than existed in *Calder* and *Keeton,* relied upon by Defendants.  While the hateful speech in those cases was disseminated from across the country before reaching the forum, because the statements were circulated also within the forum state, the Supreme Court found that jurisdiction existed.  *See Calder,* 465 U.S. at 785 (jurisdiction even though the National Enquirer was a national newspaper as long as it was also distributed in California).  Here, the same is true. Even aside from Maryland-based stations, the defamatory material similarly was aired in Maryland, albeit from radio and television towers just across the Maryland state line. This case is squarely within the *Calder* holding.

Defendants argue, second, that for jurisdiction to exist the defamatory statements must have been capable of being accessed only within Maryland.  *See* Def. Mem. at 8-9.  Controlling cases hold otherwise.  Jurisdiction exists even though the internet stories were accessible outside of Maryland, and the NBC shows could be viewed not only in Maryland, but also in the District

---

[14] As discussed above, the defamatory material published by Reveal in the March 19th Broadcast was not aired simply on stations across the country, some of which made their way across state lines into Maryland through the airwaves.  Rather, according to Defendant Reveal's website, this offensive broadcast was disseminated *from within Maryland* on radio stations located in Baltimore, Ocean City, Paramount and Frederick, Maryland.  *See supra* at 5.

of Columbia and Virginia.[15]  Once personal jurisdiction is found to exist, courts do not strip a forum of jurisdiction simply because a defendant engaged in tortious conduct elsewhere as well.

A number of cases expressly find personal jurisdiction despite the fact that there was nationwide distribution of news or other stories.  *See, e.g.*, *Calder,* 465 U.S. at 785  (finding personal jurisdiction in California despite the fact that the National Inquirer was distributed nationwide); *Keeton,* 465 U.S. at 785  (finding personal jurisdiction in New Hampshire despite the fact that Hustler was distributed nationwide); *Wellness Publ'g v. Barefoot*, 128 Fed. Appx. 266, 2005 U.S. App. LEXIS 6487 (3d Cir. N.J. 2005) (mere fact that statements were part of a national campaign insufficient to deprive the court of jurisdiction where contact also with forum); *Bragg v. Linden Research, Inc.*, 487 F. Supp. 2d 593, 598 (E.D. Pa. 2007) (finding specific jurisdiction even though statements "were made as part of a national campaign").

In addition to *Calder* and *Keeton*, the Fourth Circuit dealt with this issue in *First American First, Inc.,* 802 F.2d at 1516.  In that case, the Court held that personal jurisdiction existed when an out-of-state resident mailed defamatory material to a resident in the forum where suit was brought.  The Fourth Circuit held that even a single contact may be enough for personal jurisdiction even though there is nationwide distribution of a statement.  *See* 802 F.2d at 1516.  The court held that "[t]he allegedly defamatory letters, though written in and mailed from Illinois and distributed throughout the country, were nevertheless directed in their intended effect at the activities in Virginia of Virginia residents.  *Id.* at 1517.

---

[15] Defendants reference to *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 331 (D.C. 2000), is not only unhelpful to their cause, it actually undermines it.  The court there found that specific jurisdiction existed over a Maryland defendant who maintained a store in Maryland where the Plaintiff slipped, fell and sustained injuries.  The only thing that occurred in the District of Columbia where the suit was brought was that the defendant advertised in the District.  There was no claim that advertisements could be viewed only in D.C. Based on that decision, the bare fact that Defendants saturated Maryland airwaves with its story from the District would be sufficient, standing alone, to sustain jurisdiction.

A particularly telling example is *Gordy v. Daily News, L.P*, 95 F.3d 829 (9th Cir. 1996). In that case, the *New York Daily News* had distributed only 13 to 18 copies of a defamatory column in California, where the plaintiff resided. *Id*. The court rejected the argument that because the *Daily News* was distributed principally in New York, but elsewhere as well, there was no personal jurisdiction in California. The court held that the relatively small number of copies distributed in the state was "enough to count as a connection [needed to establish personal jurisdiction] when distributed in the state where the target is domiciled and will suffer most from damage to his reputation." *Id.* at 834.

**C.     Jurisdiction Is Even More Clearly Proper Where, as Here, Defendants Focused On A "Maryland-based Charity," and Its Actions**

Defendants argue that their statements did not have a Maryland "focus," and that this conclusion is "undisputed." Def. Mem. at 16. This contention is very much disputed.

As a preliminary matter, Defendants ignore the controlling opinion in *Calder v. Jones,* 465 U.S. 783 (1984). In that case, the Supreme Court explained what it meant when it discussed the need to show a "focus" on a resident in the forum state. The Court held that a California focus could be shown where the material "concerned the California activities of a California resident," "was drawn from California sources, . . . and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California." *Calder*, at 789. Each of these factors are considered below.

**1.     Planet Aid is a "Maryland-Based Charity"**

Defendants first argue that Planet Aid is not really a "Maryland resident," but is located in Massachusetts. *See* Def. Mem. at 2. This argument ignores the language of the Complaint, which states that Planet Aid's principal place of business is in Maryland. *See* Complaint, ¶ 17.

While claiming that the allegations of the Complaint "do not bear out," Defendants themselves repeatedly described Planet Aid as "based in Maryland." They wrote in one of their Articles that the USDA "allocated more than $133 million in foreign relief funds *to the Maryland-based charity* . . . ." *See* Complaint, Ex. E, at 1 (emphasis added). Defendants personally repeated the same claim that Planet Aid was a *"Maryland-based charity"* in an article appearing in the MinnPost. *See id.*, Ex. F, at 1 (emphasis added). They did it a third time when joining forces with NBC I-Team, another "investigative journalist," who repeatedly referred to Planet Aid as based in Maryland, and had a guest on the program from *"Planet Aid's Elkridge, Maryland headquarters."* *See id.* Ex. H, at 1 (emphasis added). And finally, Defendants claimed for a fourth time that Planet Aid was a "*Maryland charity*" in an article on May 24 *See id.* (emphasis added). Even after the lawsuit was filed, Defendants continued to refer to Plaintiff as a "*charity based in Maryland.*" Rosenthal Dec., Ex. H; emphasis added.

Ignoring all such statements, as well as others, Defendants resort to pleadings in which Planet Aid referred to its "corporate headquarters" in Massachusetts. *See* Def. Mem. at 2, 18. Defendants rely on such documents in claiming that Planet Aid really has no identifiable existence in Maryland. *See id.* There is nothing astonishing or remarkable about a corporation having its corporate headquarters and principal place of business in separate locales. *See, e.g.*, *Hertz v. Friend*, 559 U.S. 77, 89 (2010) (noting that it was possible to have "corporate headquarters, including executive offices, . . . in one State, while the corporation's plants or other centers of business activity are located in other States."). There is no shortage of companies who have their corporate headquarters in one locale and principal operations in others, including in Defendants' media industry. *See, e.g.*, https://gannett.investorhq.businesswire.com/sites/

gannett.investorhq.businesswire.com/files/doc_library/file/105721-Annual_Report.pdf   Gannett (multiple principal places of business differing from corporate headquarters).

Moreover, the declaration of Ester Neltrup clearly establishes that Planet Aid's principal place of business is in Maryland, which is why it has listed its Elkridge, Maryland address in every annual report since 2009.  Neltrup Dec. ¶ 4.  Planet Aid's principal place of business in Maryland is shown by, among other facts, the number of employees and functions performed in Maryland, site facilities there, and the fact that top management is located there.  *Id*., ¶¶ 4-6. Beyond that, it is the location where it services the donor grant program at issue in Defendants' articles and broadcasts.  *Id*., ¶ 9.  There can be no dispute that Planet Aid is located in Elkridge, Maryland, exactly as stated by Defendants in numerous articles discussed above.

Consequently, it is too late in the day for Defendants' to deny that they directed their actions at a "Maryland-based charity," to use their own words.  Planet Aid's existence in this District militates in favor of jurisdiction.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 929 (2011) ("When a defendant's act outside the forum causes injury in the forum, . . . a plaintiff's residence in the forum may strengthen the case for the exercise of specific jurisdiction.") (citing *Calder,* 465 U.S. at 788).

### 2.    Defendants Focused On Planet Aid's Activities in Maryland

Defendants next argue that even if Planet Aid is actually located in Maryland, the focus of the articles and broadcasts was not only on Planet Aid's operations in Maryland. While any such requirement goes far beyond *Calder* and its progeny, *see, e.g.*, *First American*, 802 F.2d at 1517 (upholding personal jurisdiction even though the "libelous letters were not directed only at the plaintiff's actions in [the forum]"), Defendants' own articles and publications demonstrate that this requirement is satisfied in any event.

Defendants claim that the story was not about Planet Aid's Maryland operations, but global events. *See* Def. Mem. at 22-23. But Defendants do not deny – nor could they -- that the stories focused clearly on how Planet Aid had supposedly cheated the USDA Food for Progress Program. *See, e.g.*, Complaint Ex. Ex. E, at 2 (noting that a request for an investigation followed a Reveal investigation" showing that the U.S. has allocated more than \$133 million in foreign relief funds to the Maryland-based charity . . . ").

Because the defamatory material focused on Planet Aid's involvement in the USDA Food for Progress Program, it was impossible for Defendants to avoid focusing on Planet Aid's activities in Maryland. After all, Maryland is where Planet Aid employees are, and always have been, engaged in efforts directed at development and/or management of the Food for Progress Program. With one exception, every one of the staff members employed in Planet Aid donor programs are located in Maryland. *See* Neltrup Dec., ¶10. That is why the television stories about Planet Aid's operations include several pictures, specifically, of Planet Aid's operation in Maryland. *See* Rosenthal Dec., Ex. J. [16]

Moreover, in order to support their claimed misuse of USDA funds and money laundering, Defendants wrote repeatedly about: (l) the actions taken by Planet Aid in Maryland to obtain the USDA grant; and (2) supposed misrepresentations made by Planet Aid through Maryland-based employees in the course of administering the program. As discussed below, each of these factual issues relates to activities occurring at Planet Aid's operations in Maryland**.**

In order to cover the first issue – efforts to obtain the USDA grant – Defendants determined that a centerpiece of the articles and broadcasts had to focus on Maryland employee

---

[16] The caption under the photograph reads:

In a joint investigation with Reveal at the Center for Investigative Reporting, the News4 I-Team continues its look *at the Maryland charity Planet* **Aid** and its possible connection to a controversial Danish organization called the Teachers Group. *Id; emphasis added.*

and resident Marie Lichtenberg, who had been responsible for obtaining USDA funding in the Food for Progress Program.  Defendants therefore wrote extensively about Ms. Lichtenberg, who is located in Elkridge, Maryland, which not surprisingly is where Defendants sought three times to contact her through email.  *See* Lichtenberg Dec., Exs. A-C.

In fact, Ms. Lichtenberg was so central to the story about Planet Aid and its alleged misuse of USDA funding that she is mentioned numerous times in the Articles, and there are even two pictures of her in one of the stories.  *See* Complaint, Ex, B at 2.  Under her picture Defendants wrote that "Marie Lichtenberg . . . has been the main contact between the charities and the U.S. Department of Agriculture."  *Id.*  Similarly, the captions used by Defendants to describe a timeline of events clearly shows a focus, in particular, on Maryland-based employee Lichtenberg.[17]  All of this was done in connection with the main thesis of the story that "Planet Aid, a Maryland-based charity," had defrauded the USDA.

Defendants also ignore how they tried to construct a story of how Planet Aid had mismanaged the program.  Defendants tried to compare in their articles what they called glowing statements by Planet Aid about its successes under the Food for Progress Program with actual results.  *See, e.g.*, Complaint, Ex. A, at 1.  Defendants even attached to their articles and broadcasts materials showing representations made by Planet Aid to the USDA. See, *e.g.*, Complaint, Ex. B, at 23 (referring to "[d]ocuments supplied by Planet Aid to the USDA")  All of those reports were issued in Maryland, and in fact, bear the name and Maryland phone number of Planet Aid's Maryland employee  *See, e.g.* Neltrup Dec., Ex. A (Report dated Nov. 15, 2011,

---

[17] Defendants used the following captions, among others, relating specifically to Lichtenberg in its slide timeline made part of the NBC story:  May 19, 2006 "Lichtenberg meets with USDA Secretary;" January 1, 2009 "Lichtenberg's New Year email" May 4, 2015 "Lichtenberg and [USDA Employee] Dutoi Exchange Emails."
In addition to those captions for its slides, Lichtenberg is mentioned five additional times in the slides.  *See* http://www.nbcwashington.com/investigations/Behind-the-Bins-What-Did-Planet-Aid-Do-With-Your-Taxpayer-Dollars-380333921.html.

attached as a link to the May 23rd article attached to the Complaint as Ex. B, at 2).

Nor is it convincing to argue – as Defendants do – that the focus was not on Planet Aid in Maryland, but on events in Malawi, where Defendants traveled in order to interview witnesses. *See* Def. Mem. at 6.  These interviews had a solitary purpose: to confirm that the representations made by Planet Aid to the USDA in its periodic reports emanating from Planet Aid's Maryland operation center were actually false.  This solitary purpose is shown by Defendant's own synopsis of its March 19th Broadcast which, referring to money supposedly made available to Planet Aid, stated that grant money given to Planet Aid was "supposed to help people in southern Africa," but that "when Reveal went to Malawi to find out what actually happened, people told us that some the projects didn't pan out."   Complaint, Ex. A, at 2.

Another key theme in the articles was that Planet Aid was overstating employee salaries as a result of kickbacks demanded from employees.  *See* Complaint Ex. B, at 15.  The sole purpose in delving into these alleged "kickbacks" was to corroborate the claim that Planet Aid's reports (which were issued from its Maryland location) were false.  In Defendants' own words, Planet Aid was "writing paychecks much smaller than reported to the USDA."  *Id.*

Nor does the discussion of Denmark, claimed alternatively by Defendants to be the focus of the articles, detract from the focus on Planet Aid and its misuse of USDA funds.  Defendants interviewed individuals in Denmark for one purpose: to show that Planet Aid, ***in Maryland***, was misusing USDA funds, which were being used to support a fugitive rather than assist the poor. *See, e.g.*, Complaint Ex. A, at 2 ("Our investigation finds that the U.S. government knew an international fugitive was linked to the projects, but kept the money flowing.").  In Denmark, Defendants strained hard to find even a shred of evidence that would connect Ms. Lichtenberg, in particular, to the Danish fugitive.  Defendants even went so far as to research her childhood in

- 27 -

Denmark, and her parents' association with a group that included that individual. *See* Complaint Ex. B, at 4. Even when Defendants sought out Danish law enforcement officials, they questioned each of them about Ms. Lichtenberg, in particular. *See,* Complaint Ex. B, at 12.

Consequently, the mere fact that some of the witnesses may have resided outside the United States hardly detracts from its main focus: alleged misuse of USDA funds by Planet Aid, (to which they properly refer as a "Maryland-based charity"), and its employees.

### 3. The Defamatory Materials Were "Drawn from Maryland Sources"

The last factor considered in *Calder* was whether the defamatory materials were drawn from sources in the forum. This factor is unnecessary in light of the overwhelming evidence that the articles were written about a Maryland entity and its operations in Maryland, and injuries were felt in Maryland. Nevertheless, we address this factor as it only strengthens an overwhelming record favoring jurisdiction.

The joint Reveal-NBC I-Team broadcasts which ran on May 23 and 24, 2016 expressly admitted that the story was based on statements by "*former Planet Aid employees in Maryland and in Africa . . . .*" *See Complaint,* ¶ 55. Other than Defendant Smith and NBC newscasters, the only source to appear on the show was a Maryland resident. *Id.*

Other articles are similarly drawn from Maryland sources. For example, the WAMU and other radio shows broadcast to and within Maryland on March 19th relied on a Maryland source identified as "having retired in 2015 as chief of the money laundering section of the US attorney's office in Maryland." *See, e.g.*, Ex. G, at 23. The same person was quoted in the May 23rd article, Complaint Ex. B at 21.[18] Yet another Maryland source was described as having

---

[18] The decision to use a former Assistant U.S. Attorney from this District, and not someone for, example, from the Northern District of California, or any other office less than 3,000 miles from Emeryville, California, speaks volumes. The witness really had little to say, other than that if the evidence claimed to exist by Defendants were true (which of course it is not), then "it's certainly a launching pad," and "something an investigator would look at."

been "hired in Maryland by Planet Aid as the manager of strategic partnerships, agriculture and food security. . ." *Id.* at 24. And another source quoted in the article is Maryland-based President of Planet Aid. *See id.* at 5.

Even when steering away from the claimed fraud involving USDA grant money, Defendants relied on Maryland sources to provide information. One article, "Planet Aid's ubiquitous clothing donation boxes aren't so charitable," Complaint, Ex. C, relied on Goodwill Industries International, as a source. *Id.*, at 4. Goodwill Industries is headquartered in Rockville, Maryland. *See* Rosenthal Dec., Ex. O.[19]

Furthermore, source material obtained through social media can suffice to sustain jurisdiction. In *Hare v. Richie*, Civ. No. ELH-11-3488, *32, 2012 WL 3773116 (D. Md. Aug. 29, 2012), jurisdiction was upheld despite the fact that "the bulk of thedirty.com's online activity does not consist of business transactions with Maryland residents, nor is that the activity at issue in this case." *Id.* The court held that jurisdiction was nevertheless appropriate "because defendant invites users in the forum to "'Submit Dirt.'" *Id.*

Here, Twitter was similarly used to find sources of information. For instance, the Complaint alleges that on May 23 and 24, 2016, Defendants and NBC published the defamatory story about Planet Aid, *see* Complaint, ¶ 55, which was followed by NBC tweeting out the defamatory broadcast. *See* Rosenthal Dec., Exs. F, G. When one Maryland resident responded by tweeting "stop donating to Planet Aid," Maryland resident Tisha Thompson then inquired about Planet Aid bins in Maryland. Rosenthal Dec. Ex. F, at 2. Not only did the Twitter user identify bins in Carroll County, but a second Maryland resident then responded with information

Complaint, Ex. B, at 21. Defendants picked a former Assistant from Maryland to again reinforce the Maryland nexus.

[19] The Article refers both to Goodwill Industries International, which is headquartered in Rockville, Maryland, and Goodwill Industries of North Central Pennsylvania.

about sites in Bethesda, Maryland.  *Id.*, Ex. F, at 2.  Thompson sent out a separate tweet asking others for the locations of Maryland bins.  *Id.* Ex. F, at 1.

Further, the Defendants' sources also consisted of documentary material appended to the articles, and located on Reveal's online site.  Included are numerous documents consisting of emails written to, or from, Planet Aid Maryland headquarters, as well as periodic reports issued to the USDA from Maryland.  *See supra* at 26-27.  Defendants own articles admit their heavy reliance on Maryland documents as source material, stating that "[h]undreds of emails from Lichtenberg" to, *inter alia*, the USDA were obtained by Reveal.  Complaint, Ex. B, at 10.  Defendants also suggest that either they or their "sources" may have used questionable practices to obtain documentary material from Maryland.  *See* Complaint, Ex. B, at 13 (referring to "[r]ecords from Lichtenberg's own files, from a source whose identity Reveal has agreed to protect.").

Finally, the fact that an individual chose to remain anonymous does not make them any less of a "source."  In addition to the anonymous source that evidently helped obtain materials from Lichtenberg's office, *see id.*, the Defendants published an email with the "cc" blacked out.  Complaint, Ex. B, at 32.  While the identity of the person "cc'd" on the email reprinted in the article was redacted, that person was in fact Baltimore resident Pam Fritzler.  *See* Rosenthal Dec., Ex. P (containing unredacted copy of the above email); *id.,* Ex. Q (reflecting that Fritzler is a Baltimore resident).  Fritzler joined in numerous letters and complaints to the USDA about Planet Aid, along with the author of the email, Kristine Alonge, who is repeatedly quoted in Defendants' articles as a key source.  *See* Ex. B at 32.

Consequently, far more than the mere *prima facie* showing needed to sustain jurisdiction exists here.  None of the Defendants' arguments advanced to overcome that showing have merit.

### III.    VENUE IS PROPER IN THIS DISTRICT

Defendants concede that the venue issue is driven by similar considerations as those deemed controlling in deciding personal jurisdiction.  *See* Def. Mem. at 19.  As such, based on the foregoing discussion, there is no basis for finding that venue is lacking here.

Factual contentions by Defendants are unsupportable.  Defendants contend, for instance, that "no substantial part of the . . . . publication . . . occurred in Maryland. . . ."  Def. Mem. at 20. Defendants cannot sustain that argument when stories – including on television and radio -- were published in Maryland.  *See supra* at 5-6.  Defendants' own website admits that its radio stories aired on four channels that are located in Maryland, not simply near it, *see id*, and that the two NBC episodes and WAMU DC radio stations also were broadcast into Maryland.[20]  The fact that they personally directed the defamatory material to Maryland residents, *see supra* at 8-10, 12-14, and did so in an effort to tortiously interfere with those doing business with Planet Aid, further reinforces the conclusion that venue is appropriate.  *See, e.g.*, *CIENA Corp. v. Jarrard*, 203 F.3d 312, 318 (4th Cir. 2000) (venue appropriate where injuries that plaintiff "has caused or threatens to cause were or will be sustained in Maryland").

Defendants' citations fail to deal with claims for civil conspiracy, tortious interference and defamation.[21]  Where such claims have been advanced, courts have expressly rejected the argument that venue does not lie under 18 U.S.C. §1391 simply because an otherwise actionable

---

[20] Defendants argue that the DC based broadcasts may have been incidentally distributed into Maryland, but that would still not be enough to constitute a "significant" portion of the events since the remaining broadcasts occurred elsewhere.  *See* Def. Mem. at 23.  This argument fails to consider that it was not just a single "DC based television station" that aired the show in Maryland, but rather, two such shows, plus three additional radio shows which were all broadcast from multiple locations within Maryland.  That is clearly a significant portion of the activities in the case, even if all of the other contacts are ignored.

[21] Defendants' inability to find anything close to our situation is shown by their reliance on *Davis v. Costa-Gavras*, 580 F.Supp. 1082 (S.D.N.Y. 1984), a case where suit was brought in Virginia by individuals claiming that they were defamed in a book about events while they were living in Chile during a military coup where a number of individuals were killed.  *Id.* at 1085.  In rejecting claims that venue was appropriate in Virginia, the court noted that it was not enough that the plaintiffs had lived in Virginia in the past, and that Virginia was close to the District of Columbia, where a minor portion of the events depicted in the book had occurred.  *Id*. at 1089.

statement was drafted by out-of-state residents and distributed from that out-of-state location to the forum. *See, e.g.*, *Boehner v. Heise*, 410 F. Supp. 2d 228, 240 (S.D.N.Y. 2006) (venue proper in defamation and tortious interference case where letter was written in Wisconsin, but sent to New York and referred to activities taking place in New York); *Bounty-Full Entertainment, Inc. v. Forever Blue Entertainment Group, Inc.*, 923 F. Supp. 950, 958 (S.D.Tex. 1996) (venue proper based on a letter sent from another district where the action was based on the effect of that defamatory statement in the forum).

In fact, courts have rejected the claim made here by Defendants that there can be no venue in this District because they wrote, edited and published the defamatory material while in California. *See, e.g., Akbar v. New York Magazine Co*., 490 F.Supp. 60, 67 (S.D.N.Y. 1980) (sustaining venue in D.C. even though the article in question "apparently was written, edited, and prepared for publication in New York" and that "[e]ditorial decisions relevant to this action were apparently made in New York[,] where "evidence surrounding these decisions will likely be more accessible"). Nor is it convincing that Defendants deny having interviewed anyone in Maryland. *See Miracle v. N.Y.P. Holdings, Inc.* 87 F.Supp.2d 1060, 1063 (D. Haw. 2000) (finding venue notwithstanding fact that the author of the column "resides in New York," and states "that, in writing the story, she did not contact to Hawaii for any purpose").

Moreover, multiple sources for the defamatory material are located in this District, *see supra* at 28-30, while Defendants do not identify a single source for the material in question in the Northern District of California. *See Akbar*, 490 F.Supp. at 67 (sustaining venue where sources for the articles were located in DC, although the articles were written and edited entirely in New York). Second, Plaintiff Planet Aid has suffered injuries in this District, but has no presence in the Northern District of California, and therefore no damages there. *Akbar*, *supra;*

*Cummings v. Western Trial Lawyers Assoc.*, 133 F.Supp.2d 1144, 1150 (D. Ariz. 2001) (venue proper where tort claims occurred in Arizona); *Lex Comp.& Mgmnt, Co. v. Eslinger & Co.,* 676 F.Supp. 399, 402, 403 (D.N.H. 1987) (venue appropriate in forum where injuries occurred despite fact that offensive letter was written and sent from out-of-state party); *Miracle*, 87 F.Supp.2d at 1072 (venue appropriate because the harm suffered in Hawaii notwithstanding fact that reporter was in New York and never went to Hawaii).  And finally, the defamatory material was disseminated in this forum.  *See Morton Grove Pharm. v. the National Pediculosis Assoc.*, 525 F.Supp.2d 1039, 1043-44 (N.D. Ill. 2007) ("Economic and reputational injury" in forum); *Wachtel v. Storm*, 796 F.Supp. 114, 116 (S.D.N.Y. 1992) (venue proper where defamatory letter was received notwithstanding that neither party resided in that state).

In addition to factors found sufficient to sustain venue in the cases discussed above, Defendants admit here that they actually traveled to Maryland, *see* Walters Dec., ¶ 8.  They also contacted individuals here in order to interview them, sending emails directly to them in Maryland in order to set up interviews.  *See* Lichtenberg Dec., Exs. A-C; Teppih Dec.  Third, Defendants actually obtained documents from the forum, either directly or by soliciting others to take them without permission from the Maryland facility.  *See supra* at 33.  And finally, while the above cases involved a single mode of transmission of defamatory material to the forum, Defendants here disseminated their defamatory material within the forum not only on the internet, but also by, and through, Maryland radio stations, and on radio and television stations in Washington, D.C. which have a local focus that includes Maryland, and through social media directed to Maryland residents.  *See supra* at 8-10, 12-14.

Finally, it is no more convincing in discussing venue than it was when disputing jurisdiction to argue that the subject of the articles and broadcasts was on something other than

what Defendants correctly described as a "Maryland-based charity."  The last factor is enough, without more, to sustain venue.  *See, e.g.*, *Boehner*, 410 F.3d at 240 (noting that while defendants were correct that the alleged act of writing the letter at the heart of the lawsuit occurred in Wisconsin, . . . the subject of the letter refers to activities taking place in New York" by a New York company); *Bounty-Full Entertainment*, 923 F.Supp. at 957-58.

Consequently, not only did Defendants investigate the story by reaching out to Maryland – by traveling here, as well as through the airwaves, email, and social media –but the defamatory material related directly to a Maryland charity and its operations in Maryland, and the material was distributed and caused injury in Maryland. Venue is appropriate in Maryland.

## IV.    THERE IS NO BASIS FOR DISMISSAL OR TRANSFER PURSUANT TO FORUM NON-CONVENIENS

Defendants also seek a change of venue under 28 U.S.C. § 1404.  In doing so they urge this Court to ignore a substantial body of law holding that the plaintiff's selection of forum is entitled to great weight. *Peteet v. Dow Chemical Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989). Further, Defendants bear a heavy burden in trying to overcome that choice of forum. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *SAS Institute, Inc. v. World Programming Ltd.*, 468 Fed. Appx. 264 (4th Cir. 2012)(same).

Defendants claim that "the convenience of witnesses, most particularly non-party witnesses who are important to the resolution of the case," is "often cited as the most important factor" in deciding whether to apply forum non conveniens as a basis for transfer or dismissal. Def. Mem. at 25.  It is simply false to assert that "there are no Maryland based witnesses, but many in Northern California."  Def. Mem. at 2. On the contrary, witnesses can be subpoenaed in Maryland, but not in the Northern District of California.  *See Boehner v. Heise*, 410 F. Supp. 2d at 241 (availability of process to compel attendance weighs on venue).  Witnesses here include:

- Those who were quoted in Defendants' articles, s*ee supra* at 28-29;
- Those Defendants sought unsuccessfully to question, *see* Lichtenberg and Teppih declarations;
- Those who work in Washington for the USDA and who are capable of testifying that the USDA engaged in a thorough audit of the Food for Progress program;
- Those who were otherwise involved in the development and operation of the program, *see* Neltrup Dec., ¶¶ 9-10;
- Those Defendants tried to discourage from dealing with Planet Aid, such as Chipmunk07, LBRconsulting, and AUSIS, s*ee supra* at 8-10, 12-14;
- Those contacted by NBC reporter-Reveal partner Tisha Thompson, in an effort to discourage them from using Planet Aid bins, s*ee supra* at 29; and finally,
- Those who will refuse to deal with Planet Aid because of the defamatory materials and will not want to travel 3,000 miles to testify at trial.

If the case were transferred, the Court could not even ensure the presence at trial of NBC personnel involved in two defamatory publications. *See* Complaint, ¶55. A transfer would pose a hardship also on those coming from Africa. The travel time from Malawi to California is approximately eight hours longer than that from Malawi to the DC metropolitan area.[22]

Consequently, because a change in venue would pose a substantial hardship on everyone except the Defendants, their motion should be denied

## CONCLUSION

The Motion for Dismissal of the Complaint or transfer of venue should be denied.

Respectfully submitted,

Squire Patton Boggs (U.S.) LLP
2550 M. St., N.W., Washington, D.C. 20037
(202) 457-6321; Fax: (202) 457-6315

By:

Samuel Rosenthal
(Bar No. 06170)
samuel.rosenthal@squirepb.com

Attorneys for Plaintiffs
Planet Aid, Inc. and Lisbeth Thomsen

---

[22] The shortest flight found between Blantyre, Malawi and California is 31 hours, 18 minutes. *See* Rosenthal Dec., Ex. A. This is approximately 8 hours longer than the shortest flight from Malawi to the Washington, D.C. area. *Id.*

CERTIFICATE OF SERVICE

I hereby certify that I caused to be filed electronically on November 17, 2016, a copy of the following:

MEMORANDUM OF LAW ON BEHALF OF PLAINTIFFS PLANET AID AND LISBETH THOMSEN IN OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE, OR IN THE ALTERNATIVE TO TRANSFER VENUE.

Appendix of Exhibits

Declaration of Samuel Rosenthal;

Declaration of Ester Neltrup;

Declaration of Jana Teppih;

Declaration of Marie Lichtenberg,

and that the foregoing were served via ECF on the clerk of the Court for the United States District Court for the District of Maryland, thereby serving all participants in this case.

I further hereby certify that a paper copy of the foregoing was served via overnight delivery and addressed to:

The Honorable George L. Russell, III
United States District Court for the District of Maryland
101 W. Lombard Street
Baltimore, MD 21201
(410) 962-4055

_____/s/ Samuel Rosenthal__
Samuel Rosenthal

- 36 -